## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| SCAMNETIC, INC., | X  Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| BLACKCLOAK, INC., | |
| Defendant. | |

### COMPLAINT

1.    In August 2024, Scamnetic, Inc. ("Scamnetic") released a first-of-its-kind tool to help individuals and businesses detect electronic scam attempts, no matter how sophisticated the attempt.  A key component of that tool, called "IDeveryone," allows the recipient of a communication to verify the identity of *any* counterparty, regardless of who they are, where they are located, and whether the communication came through email, text message, phone call, or some other mobile- or web-based application, and regardless of whether that counterparty uses the IDeveryone product.

2.    Since its launch, Scamnetic has marketed continues to market IDeveryone to businesses who might be interested in partnering with Scamnetic and incorporating IDeveryone into their platforms in the months leading up to its release.  It does so only under the protection of strict non-disclosure agreements,

recognizing that IDeveryone implemented valuable, proprietary and trade secret methods of detecting scams.

3.     One interested purchaser was Defendant BlackCloak, Inc. ("BlackCloak"). BlackCloak operates an app that packages various cybersecurity and identity protection features and offers them to C-suite executives and high net worth individuals. BlackCloak expressed interest in IDeveryone and signed an NDA promising to use the confidential materials Scamnetic provided *only* to evaluate a potential business partnership with Scamnetic, and for no other purpose.

4.     Instead, after receiving Scamnetic's trade secrets, BlackCloak proceeded to develop a tool identical to IDeveryone in all material respects. BlackCloak released its tool in April 2025, which it would not and could not have done without the misappropriation of Scamnetic's confidential, trade secret information.

5.     BlackCloak's development and marketing of an IDeveryone clone harms Scamnetic's ability to position itself in the marketplace and to sell its product to enterprise purchasers. Scamnetic brings this action to remedy that harm.

## THE PARTIES

6.     Plaintiff Scamnetic is a Delaware corporation with its principal place of business at 615 Channelside Drive, Suite 207, Tampa, Florida 33602.  Scamnetic is a provider of digital security services who develops and markets products that help users identify the people they interact with online and detect scam communications.

7.     Defendant BlackCloak is a Delaware corporation with its principal place of business at 7025 County Road 46A, Suite 1071, Lake Mary, Florida 32746. BlackCloak sells digital security services targeted toward executives and high net worth individuals, which are often designed and programmed by others.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Scamnetic has alleged violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, and the Court has supplemental jurisdiction over Scamnetic's other causes of action under 28 U.S.C. § 1367.

9.     BlackCloak is subject to the general jurisdiction of the courts of the State of Florida because its business headquarters is located in Florida.

10.     Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, because BlackCloak's principal place of

business is within this Division, and the parties executed a Mutual Confidentiality and Non-Disclosure Agreement selecting "the State or Federal Court in and for Orange County, Florida" as the venue for "any disputes" between them.

## FACTS

### Millions of Scam Attempts, Initiated Through a Wide Variety of Communications, Ruin the Lives of Regular People Every Year

11.    Americans reported $70,013,036 in losses from scam attempts to the FBI's Internet Crime Complaint Center in 2024.[1]  But reported losses greatly undercount actual losses from scams.  The Federal Trade Commission estimates that "about 1 in 5 people lost money" to imposter scams in 2024, totaling $2.952 billion in losses.[2]

12.    The recent boom in accessibility of large language models and other artificial intelligence tools—including those with the ability to generate "deepfake" media—has helped scammers create a larger volume of scam attempts through a variety of sources beyond email—including text message, social media,

---

[1] United States Federal Bureau of Investigation Internet Crime Report (2024), *available at* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf, at 10 (last visited May 30, 2025).

[2] United States Federal Trade Commission Consumer Sentinal Network Data Book (2024), *available at* https://www.ftc.gov/system/files/ftc_gov/images/consumer-sentinel-network-data-book-2024-image.png (last visited May 30, 2025).

messaging applications, video calls, phone calls, online dating sites, and others—which are more likely to dupe recipients at a lower cost.[3]

13.    Before Scamnetic developed its scam detection tools, legacy scam-prevention tools frequently failed to detect scam attempts launched through sources other than email.[4]

14.    For instance, "smishing" is a portmanteau of "SMS" (short message service, the technical name for a text message) and "phishing," the name for attempts by scammers to trick targets into providing personal information by disguising the request as for legitimate purposes.

15.    In recent years, smishing attacks have become increasingly more common.  In the first two quarters of 2021, smishing attacks grew by 700%.[5]  The rise in smishing attacks reflects individuals' increased comfort in responding to text messages versus emails:  whereas the click-through rate for email phishing attacks is 1.33%, smishing response rates are between 8.9% and 14.5%.[6]

---

[3] *See* Heiding et al., "AI Will Increase the Quantity – and Quality – of Phishing Scams, Harvard Business Review (May 30, 2024), *available at* https://hbr.org/2024/05/ai-will-increase-the-quantity-and-quality-of-phishing-scams (last visited May 30, 2025).

[4] *See* Nahapetyan et al., "On SMS Phishing Tactics and Infrastructure, IEE Symposium on Security and Privacy, Robocall Science (May 2024), *available at* https://robocall.science/publication/sp24/sp24.pdf (last visited May 30, 2025).

[5] *See* "Stay Alert for Fraudulent Text Message," Carnegie Mellon University Information Security Office Alert (2024), *available at* https://www.cmu.edu/iso/news/2024/smishing-news-article1.html (last visited May 30, 2025).

[6] *See* "Smishing 101:  Detecting and preventing SMS phishing attacks," Field Effect Cybersecurity Education (October 12, 2023), *available at* https://fieldeffect.com/blog/smishing-sms-phishing (last visited May 30, 2025).

**Scamnetic Developed a Proprietary Tool,
IDeveryone, to Combat Phishing and Smishing**

16.    Scamnetic developed an AI-based tool called "IDeveryone" to detect even sophisticated scam attempts.

17.    Scamnetic released IDeveryone to the public in August of 2024.  It took Scamnetic over a year to develop IDeveryone, from concept to release.

18.    As the name suggests, IDeveryone allows users to verify the identity of the counterparty to any communication, taking human judgment out of the decision to respond.

19.    IDeveryone initiates a peer-to-peer identity verification process whereby the recipient of a communication may issue a request to the sender to confirm their identity in real time.  IDeveryone works regardless of whether the person on the other side of a communication is an IDeveryone user or not.

20.    At a high level, IDeveryone first verifies that the person the communication counterparty purports to be is, in fact, a real person, and then verifies that the communication counterparty is that person.  As such, IDeveryone is able to detect even scam attempts that use sophisticated artificial intelligence-powered tools to create artificial media to impersonate real people, colloquially known as "deepfakes," and provides users with clear warning and actionable guidance on such attempts.

21.     IDeveryone's peer-to-peer identity verification functionality is proprietary to Scamnetic, is not publicly known or available, and is novel to the cybersecurity industry.

22.     The concept of IDeveryone was also novel in the cybersecurity industry when the product launched.  IDeveryone was the first product on the market that implements "identity-proofing"—that is to say, direct user-to-user identity verification—methods for consumers to verify the identities of the person on the other end of a communication.  Prior to Scamnetic's development of IDeveryone, identity verification tools were available only to businesses who were seeking to ascertain the identities of their customers or employees.

23.     As of the date of this Complaint, Scamnetic does not sell IDeveryone to individual consumers.  Rather, Scamnetic seeks enterprise partners who will purchase and deploy the tool through their own platforms.

24.     IDeveryone is useful to both the end consumer and the businesses that offer the product to their consumers.  For example, banks often have no way of knowing whether the bank or other financial institution on the opposite side of an arranged transaction has done a thorough job verifying the identity of an individual opening a new account or seeking to use an existing account. IDeveryone decreases the risk banks face from executing scam transactions for

their customers by allowing the parties arranging the transaction to verify each other's identity.

25.    The only way for businesses interested in deploying IDeveryone to access the tool is to become a Scamnetic partner.

26.    As part of the partnership process, Scamnetic provides interested purchasers with a demonstration of the product, with confidential and proprietary materials that explain the product's capabilities and technology, and with trial accounts to access a sample of the product.

27.    To protect the confidentiality of its product and underlying trade secrets, Scamnetic requires interested purchasers to sign a non-disclosure agreement promising that they will maintain the confidentiality of the information provided, and will only use that confidential information to evaluate whether to become a Scamnetic partner.

28.    The only information available to potential customers who do not sign an NDA—even now that IDeveryone has officially released—is a high-level description of the product on Scamnetic's website.  That description does not even disclose that IDeveryone uses a peer-to-peer mechanism, let alone how that mechanism works.

### A Mutual Connection Introduced Scamnetic to
### BlackCloak to Discuss Partnership Opportunities

29.    In February of 2024, Scamnetic's contact at a security consulting firm

and Scamnetic advisor introduced Scamnetic to BlackCloak to explore potential

"synergies downstream" because of BlackCloak's focus on "ultra high net worth

and C suite types," and cited the fact that BlackCloak may be interested in using

Scamnetic's technical tools in its own mobile application.

30.    BlackCloak's founder, Chris Pierson, is not a programmer by training

and does not possess the domain expertise to conceptualize and develop a tool like

IDeveryone independently.    Rather, as Scamnetic's security consulting contact

suggested, BlackCloak generally sources technical security tools from others and

compiles them for use by high net worth individuals and executives.

31.    Between February and May 2024, Scamnetic and BlackCloak began to

discuss potential partnership opportunities through which Scamnetic would

provide technical algorithms and tools to BlackCloak, that BlackCloak would use

in its mobile app.

### Scamnetic Allowed BlackCloak to Evaluate Its Proprietary Technical
### Information for a Potential Business Partnership Upon Signing an NDA

32.    On May 31, 2024, Scamnetic executed a Mutual Confidentiality and

Non-Disclosure Agreement (the "NDA") drafted by BlackCloak to facilitate the

provision of confidential trade secret business information to BlackCloak.  A true copy of the NDA is attached as Exhibit 1.

33.    Under Paragraph 1(i) of the NDA, "[e]ach party acknowledges, understands and agrees that a Disclosing Party possesses valuable commercial assets in the form of information in written, electronic, or other media, some of which may be disclosed verbally and all of which is confidential and of a proprietary nature, including but not limited to business plans, business concepts and ideas, intellectual property, trade secrets, formulas, processes, . . . know how, . . . and any other information that is not publicly known and derives value from not being publicly known."  (Ex. 1 ¶ 1(i)).

34.    The NDA defines such information, along with other confidential information not directly relevant to this Complaint, as "Confidential Information." (Ex. 1 ¶ 1(i)).

35.    Under the NDA, the only "Permitted Use" of Confidential Information was to explore "the possibility of entering into a potential business relationship or in connection with a business relationship that develops."  (Ex. 1 at 1).

36.    As a condition of receiving Confidential Information, BlackCloak "covenant[ed] and agree[d] . . . into perpetuity" that, among other things:  (1) it would hold the Confidential Information "in strict secrecy and confidence"; (2)

beyond Permitted Use, it would not "make any use whatsoever of Confidential Information without the prior written consent of Disclosing Party expressly waiving the restrictions provided herein, and not to use such Confidential Information in connection with any work performed by the Receiving Party for itself or for any other person, firm or entity"; (3) it would "not [] reproduce or distribute Confidential Information in any form, tangible or otherwise"; and (4) it would "take commercially reasonable steps to protect the Disclosing Party's Confidential Information within [BlackCloak] to those people whom [BlackCloak] deems have a need to see and use it and who have agreed to be bound by the provisions of this [NDA]."   (Ex. 1 ¶ 1(ii)).

37.     The parties further agreed that "a breach of any part of the [NDA] would result in irreparable harm to the Non-Defaulting Party," and that the Non-Defaulting Party "shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive or other equitable relief to enforce the provisions of the [NDA], which relief shall be in addition to any other rights and remedies available to the Non-Defaulting Party."   (Ex. 1 ¶ 2(ii); *see also* Ex. 1 ¶ 2(iii)).

38.     The parties further agreed that any responsibility of the party seeking an injunction to post a bond or security would be waived.  (Ex. 1 ¶ 2(ii)).

39.     The parties further agreed that any "Defaulting Party" under the NDA would indemnify and hold the "Non-Defaulting Party" harmless from and

against "any and all loss, damage, cost or expense (including reasonable attorneys' fees and costs) resulting from or arising out of the breach of any covenant or agreement made herein by Default Party or any of its officers, directors, employees, agents representative or affiliates."  (Ex. 1 ¶ 2(ii)).

40.     The parties further agreed that "Nothing in [the NDA] is intended to grant any property rights, by license or otherwise, to either party under any patent, mask work right, or copyright, trademark, or other intellectual property right, nor shall [the NDA] grant any party any rights in or to the Confidential Information of the other party as expressly set forth herein.  The Receiving Party acknowledges and agrees that any and all Confidential Information received by it under [the NDA] is of a confidential, proprietary and/or trade secret nature to the Disclosing Party and that, as to the parties, the Disclosing Party owns all intellectual property rights in any applicable Confidential Information."  (Ex. 1 ¶ 5).

41.     Under Paragraph 6(iii) of the NDA, the parties further agreed that "[i]n the event of any litigation arising out of [the NDA], the prevailing party shall be entitled to reasonable attorneys' fees and expenses from the losing party, whether incurred before suit is brought, in the course of any injunction proceedings, before or after trial or arbitration, on appeal, or in insolvency proceedings."  (Ex. 1 ¶ 6(iii)).

42.     On or about Thursday, June 6, 2024, one week after BlackCloak executed the NDA, Scamnetic met with Matt Covington, BlackCloak's Vice President of Product, and Allison Owen, BlackCloak's Chief of Staff, and provided a walkthrough of IDeveryone.

43.     As part of that walkthrough, Scamnetic provided BlackCloak with a PowerPoint deck and a copy of a competitive analysis regarding IDeveryone.

44.     The PowerPoint deck, among other things, contained screen captures showing substantially all of the features and functionality of IDeveryone, and the competitive analysis showed the unique features of Scamnetic's offerings versus then-existing products in the market, which lacked similar features.

45.     Neither the content of the PowerPoint deck nor the competitive analysis that Scamnetic provided to BlackCloak is available publicly.  Specifically, the PowerPoint deck disclosed the peer-to-peer aspects of the experience, including the way that the mechanism works from a technological perspective, which Scamnetic does not share publicly or with anyone absent an NDA.

46.     In an email dated June 10, 2024, BlackCloak's VP of Product, Matt Covington, emailed Scamnetic's founders, Al Pascual and John Evans, saying that he "had an opportunity to review our conversation with Chris [Pierson] at the end of last week," and that BlackCloak was "definitely interested in the opportunity to

work with Scamnetic as a design partner through the rollout of the API to the Scamnetic platform."

47.     In the same email, Mr. Covington also told Mr. Pascual and Mr. Evans that BlackCloak wanted to schedule a follow-up meeting "over the next week or so . . . to discuss the next steps," and offered specific dates and times for such a meeting.

48.     While Scamnetic repeatedly tried to schedule further discussions with BlackCloak over the next few months, BlackCloak did not accept Scamnetic's offers for further discussion.

49.     In December, Mr. Covington advised Scamnetic that BlackCloak remained "interested in the overall project, but alignment with our roadmap will likely push a more active partnership back to Q1 [2025] at the earliest."

50.     BlackCloak never further pursued a business partnership with Scamnetic after Mr. Covington's email in December.

51.     Upon information and belief, BlackCloak had no intention of pursuing a partnership with Scamnetic as envisioned in the NDA.  Rather, simultaneous with BlackCloak's repeated expressions of interest in partnering with Scamnetic, BlackCloak was either developing or working with a third party to develop a product with functionality nearly identical to IDeveryone using the confidential and proprietary information obtained from Scamnetic.

**In April 2025, BlackCloak Launched an
"Identity Verification" Feature Nearly Identical to IDeveryone**

52.    In April 2025, exactly one year after Scamnetic shared the proprietary technology behind IDeveryone to BlackCloak, BlackCloak launched its own "Identity Verification" feature that purportedly "ensures the authenticity of every voice and video message to prevent deepfakes and impersonation attempts."[7]

53.    BlackCloak's Identity Verification tool is strikingly similar to Scamnetic's IDeveryone tool in all significant respects.

54.    Like IDeveryone, BlackCloak's Identity Verification feature uses a process by which the recipient of a communication sends a request to the sender of the communication, and the sender then submits a response to an internal system.  The system then informs the recipient whether the sender's identity has been verified.

55.    Just as Scamnetic presented IDeveryone to BlackCloak, BlackCloak's Identity Verification tool is able to generate a request to verify the identity of a counterparty from a mobile device.

56.    Even BlackCloak's marketing strategy for Identity Verification was strikingly similar to how Scamnetic first described IDeveryone to BlackCloak in June 2024, and to Scamnetic's marketing of IDeveryone when it released the tool

---

[7] *See* https://blackcloak.io/identity-verification/ (last accessed May 30, 2025).

in August 2024. In Scamnetic's press release for IDeveryone, it said that the tool "helps consumers detect every type of scam including deepfake video and audio across any channel in real time, removing human error from the process."[8]

57.    In its press release dated April 22, 2025,[9] BlackCloak claimed that it had developed an "Industry-First" tool:





58.    BlackCloak's claim that it had developed an "Industry-First" tool was false. Scamnetic's IDeveryone tool has the same functionality to combat phishing

---

[8] See https://scamnetic.com/blog/scamnetic-launches-ai-scam-solution/ (last accessed May 30, 2025).
[9] See https://blackcloak.io/news-media/blackcloak-launches-industry-first-identity-verification-solution-to-combat-deepfake-powered-and-other-impersonation-attacks/ (last accessed May 30, 2025).

attacks using deepfake media and other AI-powered information, and had been released eight months prior, in August 2024.

59.    To the extent there was any doubt as to what "Industry" the press release referred to, BlackCloak's founder, Chris Pierson, clarified in a statement in the release that "the cybersecurity industry to date has been unable to provide the necessary tools to detect and stop deepfakes targeting executives, as systems typically must be placed between the attacker and the target to analyze content."

60.    Scamnetic is part of the cybersecurity industry.

### BlackCloak's Use of Confidential Trade Secret Information About IDeveryone Caused Substantial Damage to Scamnetic

61.    In the cybersecurity industry, breaking feature parity is critical to differentiating one's brand from the rest of the market.

62.    When Scamnetic released IDeveryone in August 2024, it was a one-of-a-kind tool.  Offering a tool that could not be obtained elsewhere allowed Scamnetic to easily articulate its value proposition to the market.

63.    BlackCloak's unauthorized use of Scamnetic's trade secret information to produce Identity Verification, a direct competitor to IDeveryone, has damaged and continues to damage Scamnetic's ability to stand out in the market.

64.    BlackCloak exacerbated the harm to Scamnetic by falsely marketing Identity Verification as an "Industry-First" tool.

65.     BlackCloak was aware that Scamnetic had already developed a similar tool because it had seen it months earlier, and had signed an NDA promising not to disclose or use Scamnetic's Confidential Information other than to explore potential business opportunities between the companies.

66.     If continued unabated, BlackCloak's misappropriation of Scamnetic's proprietary technological and confidential information to create an identical tool suggests to Scamnetic's potential customers that they may do the same, further damaging the niche in the cybersecurity industry that Scamnetic has spent years developing.

## CAUSES OF ACTION

### COUNT I
### Violation of the Defend Trade Secrets Act
(18 U.S.C. § 1836)

67.     Scamnetic re-alleges and incorporates paragraphs 1 through 66 above as if fully set forth herein.

68.     The technology, architecture and functionality of IDeveryone is trade secret information.  Scamnetic is the owner of these trade secrets.

69.     After Scamnetic and BlackCloak signed an NDA to explore a potential partnership arrangement, Scamnetic provided confidential and proprietary information regarding IDeveryone, walked BlackCloak through IDeveryone and gave BlackCloak trial access to the platform.

70. After receiving Scamnetic's Confidential Information relating to IDeveryone in April 2024, BlackCloak advised that it was "definitely interested" in partnering with Scamnetic and continued to express interest through the end of 2024.

71. However, less than a year after receiving Scamnetic's Confidential Information relating to IDeveryone and just months after its last expression of interest in a partnership, BlackCloak released a substantially similar user-to-user identity verification tool. Without access to IDeveryone, BlackCloak lacked the capability to design a substantially similar tool independently. BlackCloak thus misappropriated the processes Scamnetic's proprietary and confidential technology behind IDeveryone.

72. IDeveryone is intended for use in interstate or foreign commerce. Scam attempts frequently come from sources outside the United States through telecommunications channels, and seek to obtain users' personal information, data, or assets through those same channels.

73. BlackCloak willfully and maliciously misappropriated Scamnetic's trade secret information in IDeveryone by entering into an NDA to obtain a detailed description of the technology utilized in IDeveryone, by failing to follow through on partnership discussions to use the tool legitimately, and then by using

the tool to design a competitive product without Scamnetic's permission, or compensating Scamnetic for the proprietary tool that it developed.

74.    An injunction is needed to prevent BlackCloak from marketing or selling its Identity Verification feature based on Scamnetic's trade secret information, or from otherwise using Scamnetic's trade secret information in any other way, and also instructing BlackCloak to destroy any copies of Scamnetic's trade secret information it obtained as a result of the NDA it signed with BlackCloak in 2024.

75.    Scamnetic seeks damages in an amount to be determined at trial, but including: (1) actual losses Scamnetic suffered as a result of BlackCloak's misappropriation of its trade secrets; (2) disgorgement of any unjust enrichment BlackCloak obtained by misappropriating its trade secrets; and (3) "exemplary damages in an amount not more than 2 times the amount of damages awarded under" numbers (1) and (2) above.  18 U.S.C. § 1836(b)(3)(B)-(C).

76.    Scamnetic also seeks recovery of its reasonable attorney's fees incurred in the litigation of this action under 18 U.S.C. § 1836(b)(3)(D).

## COUNT II
## <u>Violation of the Florida Uniform Trade Secrets Act</u>
(Fla. Stat. 688.001-009)

77.    Scamnetic re-alleges and incorporates paragraphs 1 through 66 above as if fully set forth herein.

78.     The technology, architecture and functionality of IDeveryone is trade secret information.  Scamnetic is the owner of these trade secrets.

79.     BlackCloak used Scamnetic's materials showing the architecture, features, and marketing strategy Scamnetic developed for IDeveryone without Scamnetic's express or implied consent.  BlackCloak acquired that information under guise of an NDA, and then used it for purposes that Scamnetic never authorized to develop its Identity Verification tool that it would not have otherwise been able to develop independently.

80.     Scamnetic thus seeks an injunction preventing BlackCloak from marketing or selling its Identity Verification tool derived from Scamnetic's trade secret information, or from otherwise using Scamnetic's trade secret information in any other way, and also instructing BlackCloak to destroy any copies of Scamnetic's trade secret information it obtained as a result of the NDA it signed with BlackCloak in 2024.

81.     Scamnetic seeks damages in an amount to be determined at trial, but including: (1) actual losses Scamnetic suffered as a result of BlackCloak's misappropriation of the trade secret; (2) disgorgement of any unjust enrichment BlackCloak obtained by misappropriating the trade secret; and (3) "exemplary damages in an amount not exceeding twice any award made under" numbers (1) and (2) above.  Fla. Stat. 688.004.

82.     Scamnetic also seeks recovery of its reasonable attorney's fees incurred in the litigation of this action under Florida Statute 688.005.

## COUNT III
## Breach of Contract

83.     Scamnetic re-alleges and incorporates paragraphs 1 through 66 above as if fully set forth herein.

84.     Scamnetic and BlackCloak entered into a Mutual Confidentiality and Non-Disclosure Agreement dated and effective May 31, 2024, a valid and enforceable contract.

85.     Under paragraph 1(i) of that NDA, BlackCloak "understands and agrees that as a condition to receiving any of the Confidential Information [from Scamnetic] . . . not to make use whatsoever of Confidential Information without the prior written consent" of the party disclosing that information, and "not to use such Confidential Information in connection with any work performed . . . for itself." (Ex. 1 ¶ 1(i)).

86.     The only "Permitted Use" of Confidential Information under that contract was to explore "the possibility of entering into a potential business relationship or in connection with a business relationship that develops." (Ex. 1 at 1).

87.     Indeed, BlackCloak specifically disclaimed that Scamnetic was granting any property rights, by license or otherwise, in the Confidential

Information provided pursuant to the NDA and agreed that the Disclosing Party under the NDA (*i.e.*, Scamnetic) "owns all intellectual property rights in any applicable Confidential Information."  (Ex. 1 ¶ 5).

88.    Scamnetic never provided BlackCloak any other written permission to use any information regarding IDeveryone, or any other Confidential Information that Scamnetic provided to BlackCloak underthe NDA.

89.    As a condition of receiving Confidential Information, BlackCloak "covenant[ed] and agree[d] . . . into perpetuity" that, among other things:  (1) it would hold the Confidential Information "in strict secrecy and confidence;" (2) beyond Permitted Use, it would not "make any use whatsoever of Confidential Information without the prior written consent of Disclosing Party expressly waiving the restrictions provided herein, and not to use such Confidential Information in connection with any work performed by the Receiving Party for itself or for any other person, firm or entity;" (3) it would "not [] reproduce or distribute Confidential Information in any form, tangible or otherwise;" and (4) it would "take commercially reasonable steps to protect the Disclosing Party's Confidential Information within [BlackCloak] to those people whom [BlackCloak] deems have a need to see and use it and who have agreed to be bound by the provisions of this [NDA]."   (Ex. 1 ¶ 1(ii)).

90.     Scamnetic relied on the protections and representations in the NDA when it provided BlackCloak with Confidential Information its confidential and proprietary materials regarding IDeveryone.

91.     BlackCloak breached the NDA by using Scamnetic's detailed description of IDeveryone and other Confidential Information without Scamnetic's written consent to do so, and used Scamnetic's Confidential Information in "work performed . . . for itself."

92.     BlackCloak's breach of the NDA caused damage to Scamnetic including, but not limited to, lost revenue, diminution in value of its confidential intellectual property, and damage to Scamnetic's overall brand reputation as the clear first developer of the IDeveryone tool, or tools like it.

93.     In addition to an award of monetary damages, Scamnetic also seeks an injunction preventing BlackCloak from marketing or selling its Identity Verification tool improperly derived from Scamnetic's Confidential Information, or from otherwise using or disclosing Scamnetic's Confidential Information without its consent.  The parties specifically agreed to the availability of injunctive relief in the NDA and waived any bond requirement that might otherwise be required.  (Ex. 1 ¶ 2(ii)).

94.    Scamnetic also seeks to recover its reasonable attorney's fees and expenses incurred in connection with this action, which the contract expressly allows.

## COUNT IV
## Violation of the Florida Deceptive and Unfair Trade Practices Act
(Fla. Stat. 501.211(2))

95.    Scamnetic re-alleges and incorporates paragraphs 1 through 66 above as if fully set forth herein.

96.    BlackCloak's use of an NDA to obtain information regarding the design and functionality of Scamnetic's IDeveryone tool, which otherwise would not have been obtainable from Scamnetic absent the NDA, constitutes "unfair or deceptive acts or practices" under the meaning of Florida Statute 501.204(1).

97.    BlackCloak's marketing of Identity Verification, including its claim that BlackCloak is the "first" company to offer a tool similar to its Identity Verification feature, constitutes "unfair or deceptive acts or practices" under the meaning of Florida Statute 501.204(1).

98.    BlackCloak's unauthorized use of Scamnetic's materials regarding IDeveryone and its claim that the Identity Verification tool is the "first" of its kind caused the value of Scamnetic's brand and intellectual property to be diminished, which BlackCloak would not otherwise have been able to develop.

99.    BlackCloak's claim that its tool is an "Industry First" solution also deceives and harms consumers as it misleads them into believing that BlackCloak's tool is new and innovative when, in fact, Scamnetic had released a substantially similar tool nearly a year earlier.

100.    Because of BlackCloak's use of such unfair and deceptive acts and practices, Scamnetic is entitled to recover its actual damages in an amount to be determined at trial.

101.    Scamnetic further seeks to recover its "attorney's fees and court costs" under Florida Statute 501.211(2).

## COUNT V
## Conversion of Confidential Information

102.    Scamnetic re-alleges and incorporates paragraphs 1 through 66 above as if fully set forth herein.

103.    Scamnetic provided confidential business information to BlackCloak under guise of the NDA, which BlackCloak used without Scamnetic's permission.

104.    BlackCloak's use of such information is inconsistent with Scamnetic's ownership rights over such confidential business information, which include Scamnetic's right to exclude others from the use of that confidential business information, and is also inconsistent with BlackCloak's contractual obligations under the NDA.

105.    BlackCloak's unauthorized use of Scamnetic's confidential business information has damaged Scamnetics in an amount to be determined at trial.

## COUNT VI
## <u>Unjust Enrichment</u>

106.    Scamnetic re-alleges and incorporates paragraphs 1 through 31 and 42 through 66 above as if fully set forth herein.

107.    Scamnetic's provision of Confidential Information to BlackCloak regarding IDeveryone conferred a benefit upon BlackCloak.

108.    BlackCloak had knowledge of that conferred benefit.

109.    BlackCloak voluntarily accepted and retained Scamnetic's Confidential Information, including for purposes beyond those for which Scamnetic provided it in the first place.

110.    BlackCloak used Scamnetic's Confidential Information without Scamnetic's consent to produce a user-to-user "identity proofing" tool that it could not otherwise have produced absent that Confidential Information, and is now profiting from the sale of its own competing tool to Scamnetic's detriment.

111.    It would be inequitable to allow BlackCloak to retain the revenues and profits it is now receiving from its Identity Verification feature, which could not have been developed without reference to Scamnetic's Confidential Information.

## **Prayer for Relief**

Accordingly, Scamnetic respectfully requests that judgment be entered in its favor, and that the Court issue an order:

(1) enjoining BlackCloak from using or disclosing Scamnetic's confidential and trade secret business information in any way, including the sale or other use of its Identify Verification feature and any other tool BlackCloak has developed or is developing by reference to such confidential and trade secret business information;

(2) awarding Scamnetic its actual damages in an amount to be determined at trial;

(3) disgorging from BlackCloak ill-gotten profits from its unauthorized use of Scamnetic's confidential or trade secret business information;

(4) awarding Scamnetic exemplary damages of two times the amount of its calculated damages;

(5) awarding Scamnetic attorney's fees and expenses incurred in the preparation and litigation of this action; and

(6) awarding Scamnetic such other and further relief as the Court deems just and reasonable under the circumstances.

Dated: June 2, 2025

By:    *s/ Aaron S. Blynn*

Aaron S. Blynn, Esq.
Florida Bar No. 073464
asblynn@venable.com
801 Brickell Avenue
Suite 1500
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

Jaclyn M. Metzinger*
Gregory C. Pruden*
KELLEY, DRYE & WARREN
LLP
3 World Trade Center
New York, NY 10007
(212) 808-7800
jmetzinger@kelleydrye.com
gpruden@kelleydrye.com

**Pro Hac Vice* Motions
Forthcoming

*Attorneys for Scamnetic, Inc.*